# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | |
|---|---|
| **JASON KELL,** | ) |
| **Plaintiff,** | ) ) ) |
| v. | ) ) Civil Action Number ) **6:20-cv-01363-AKK** |
| **KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,** | ) ) ) ) ) |
| **Defendant.** | ) ) ) |

## MEMORANDUM OPINION

Jason Kell seeks review of the decision of the Acting Commissioner of the Social Security Administration denying benefits. Doc. 1. Kell contends that the Administrative Law Judge's decision is not supported by substantial evidence because the ALJ improperly discredited Kell's pain-related testimony, *see* doc. 17 at 5, and should have given "significant weight" to the opinion of a testifying neurologist, *see id.* at 13. After reviewing these contentions and the record, however, the court concludes that the ALJ's decision is due to be affirmed, as explained herein.

### I.

Kell, who previously worked as a saw operator, meter reader, stocker, and hand packager, applied for disability benefits in 2019 based on severe pain and limited mobility. *See* R. 28; R. 44–45; R. 49. After the SSA denied his claims, Kell, his attorney, a neurologist, and a vocational expert attended a hearing before an ALJ,

who found that Kell was not disabled.  *See* R. 15; R. 29.  The SSA Appeals Council denied review, R. 1, and the ALJ's decision became the decision of the Acting Commissioner.  Kell thereafter filed this petition for review.  Doc. 1.

## II.

On review, the court may decide only whether the record contains substantial evidence to support the ALJ's decision and the ALJ applied the correct legal principles.  42 U.S.C. § 405(g); *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020).  Courts review de novo the legal conclusions upon which the Commissioner's decision is based, while the Commissioner's factual findings are conclusive if supported by "substantial evidence."  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  Substantial evidence refers to "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.*  This threshold "is not high," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), and requires "less than a preponderance," *Moore*, 405 F.3d at 1211.  Thus, if substantial evidence supports these findings, the court must affirm, even if the evidence preponderates against them.  *Noble*, 963 F.3d at 1323.

When determining whether substantial evidence exists, the court cannot decide the facts anew, reweigh the evidence, or substitute its judgment for the Commissioner's.  *Id.*; *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The court also cannot automatically affirm the decision.  *Lamb v. Bowen*, 847 F.2d

698, 701 (11th Cir. 1988). Rather, the court "retain[s] an important duty to 'scrutinize the record as a whole' and determine whether the agency's decision was reasonable." *Simon v. Comm'r of Soc. Sec.*, 7 F.4th 1094, 1104 (11th Cir. 2021) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).

### III.

The Social Security Act "places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous work." *Bloodsworth*, 703 F.2d at 1240. Indeed, "[t]his stringent burden has been characterized as bordering on the unrealistic." *Id.* (collecting cases). To qualify for benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 416(i)(1). The ALJ must determine, in sequential order:

> (1) whether the claimant is currently unemployed;
> (2) whether the claimant has a severe impairment;
> (3) whether the impairment meets or equals one listed by the Commissioner;
> (4) whether the claimant is unable to perform his or her past work; and
> (5) whether the claimant is unable to perform any work in the national economy.

20 C.F.R. § 404.1520(a); *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next

question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel*, 800 F.2d at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).[1]

While evaluating the claimant's record, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his [or her] decision, so long as the ALJ's decision . . . is not a broad rejection which is not enough to enable [the court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)). In addition, the ALJ will not defer or give any specific weight to any medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(a). To determine the persuasiveness of a medical opinion or prior administrative finding in the record, the ALJ focuses on factors that include supportability,[2] consistency,[3] the medical

---

[1] If a claimant's impairments do not meet or equal a listed impairment, the ALJ determines the claimant's "residual functional capacity" based on "all of the relevant medical and other evidence" in the record. 20 C.F.R. § 404.1520(e). *See also* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."). The ALJ uses the residual functional capacity to determine if the claimant can perform past relevant work and, if not, if the claimant can adjust to other work. 20 C.F.R. § 404.1520(e).

[2] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

[3] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

4

source's relationship with the claimant,[4] and the medical source's specialization.[5] *Id.* § 404.1520c(c). The most important factors are supportability and consistency, and the ALJ must articulate how persuasive he or she finds the medical opinions and prior findings in the record. *Id.* § 404.1520c(a).

Further, when a claimant provides testimony concerning "pain or other subjective symptoms," the ALJ must determine whether there exists "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the record shows the claimant has a "medically determinable impairment that could reasonably be expected to produce her symptoms," the ALJ must assess the "intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work." *Costigan v. Comm'r of Soc. Sec.*, 603 F. App'x 783, 786 (11th Cir. 2015) (citing 20 C.F.R.

---

[4] This includes the length of the treatment relationship, the frequency of the examinations, the purpose of the treatment relationship, the extent of the treatment relationship (*e.g.*, the kinds of testing performed), and the examining relationship (*i.e.*, whether the medical source actually examined the claimant or only reviewed the claimant's file). *Id.* § 404.1520c(c)(3).

[5] "Specialization" refers to whether the medical source has received "advanced education and training to become a specialist," which may render that source's findings more persuasive. *Id.* § 404.1520c(c)(4). In addition, the ALJ may consider evidence showing that a medical source "has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." *Id.* § 404.1520c(c)(5).

§ 404.1529(c)(1)). The ALJ must consider "all of the record," including objective medical evidence, the claimant's history, and statements by the claimant and the claimant's doctors, and the ALJ may consider factors like the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or symptoms; the type, dosage, effectiveness, and side effects of the claimant's medication; and treatments other than medication. *Id.*

Last, the ALJ must examine the claimant's symptom-related testimony in relation to all of the other evidence and consider whether there are any "inconsistencies or conflicts between those statements and the record." *Id.* If the ALJ subsequently discredits the claimant's testimony, the ALJ must "articulate explicit and adequate reasons for doing so," and the failure to articulate the reasons for discrediting this testimony "requires, as a matter of law, that the testimony be accepted as true." *Wilson*, 284 F.3d at 1225 (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). But the court "will not disturb a clearly articulated credibility finding supported by substantial evidence." *Mitchell*, 771 F.3d at 782 (internal citations omitted).

**IV.**

In this case, at Step One, the ALJ determined that Kell had not engaged in substantial gainful activity since his alleged onset date in 2018. R. 17. At Step Two, the ALJ found that Kell suffered from severe impairments: post bilateral carpal

tunnel syndrome; bilateral ulnar neuritis; post bilateral elbow cubital tunnel syndrome, post release; degenerative disc disease of the cervical spine; degenerative disc disease/stenosis of the lumbar spine, post fusion at the L3-4 level; post left knee surgery for meniscectomy; and obesity. R. 18. The ALJ deemed Kell's hypertension nonsevere because it "[was] controlled with medication and [did] not result in any work-related limitations." *Id.*

The ALJ also determined that Kell had "no limitation[s]" in his mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. *See* R. 19–20. The ALJ noted that Kell "requested and received therapy" for opiate dependence and reported improvements without relapse or anxiety in 2019 and 2020. *See* R. 20–21. The ALJ thus deemed Kell's "mental complaints" nonsevere. R. 21.

The ALJ turned to Kell's pain-related symptoms and testimony and determined that although Kell's impairments could reasonably be expected to cause his pain and limited mobility, his statements about the intensity, persistence and limiting effects of these symptoms were inconsistent with the evidence. *Id.* First, the ALJ provided a summary of Kell's hearing testimony, which Kell confirms is accurately described, *see* doc. 17 at 4:

> At the hearing, [Kell] testified to an inability to work because of pain and mobility issues. He has lower back pain, stiffness, and numbness

7

> in his feet. He also has knee pain. He cannot bend or stoop. He estimated that he could sit thirty to forty-five minutes without having to get up and stand or walk about thirty to forty-five minutes. [He] further testified that he has pain in both hands and problems grasping. He does not do a whole lot during the day but takes care of household chores while his wife works. He does laundry, washes dishes, and [does] light cooking. He occasionally vacuums, mops, and sweeps. He has no problems dressing himself, buttoning his shirt, or using a zipper. He drives to church, the store, and to doctor appointments.

R. 21–22. The ALJ then walked through Kell's medical visits, beginning with records from The Orthopaedic Center in 2017 and 2018 that documented Kell's knee-related pain and treatment. *See* R. 22. During a December 2017 visit, a doctor discussed the results of Kell's MRI and recommended that he undergo arthroscopic surgery to treat his left knee. *See id.*; R. 476; R. 556. The ALJ noted that Kell received this surgery in February 2018, R. 22; R. 478, and that his recovery went well as his swelling and soreness improved in the weeks that followed, *see* R. 22; R. 548–50. As the ALJ summarized, Kell's records from April 2018 indicated that "[h]e was weight bearing and without a brace," that he "had full range of motion [and] normal motor strengths at 5/5," and that his "neurovascular [was] intact." *See* R. 22; R. 548; R. 545. The ALJ also noted that in September 2018, Kell "complain[ed] of some occasional knee pain, especially with climbing stairs and standing," "[his] examination was again essentially normal, other than some mild laxity and mild swelling," and he was referred to physical therapy. R. 22; R. 536.

The ALJ then reviewed records from Kell's 2018 and 2019 medical visits documenting his symptoms and treatment for his back pain. R. 22. In particular, the ALJ noted that Kell underwent "successful surgery for an extreme lateral lumbar interbody fusion" in August 2018 and that postoperative examinations in 2018 and 2019 "show[ed] he was doing well, [and] he was happy with his progress, continuing to improve, and had no complaints." *Id.*; R. 482–86; R. 523. The ALJ also commented that Kell's exams "show[ed] he had normal motor strengths, negative straight leg raising tests, and no tenderness to palpation," that "[h]is gait was stable and balanced and he was able to walk heel to toe," and that "[h]e tolerated deep squats." R. 22; R. 523–24.

The ALJ also referred to records from Kell's visits to physical therapy throughout 2018. *See* R. 23. The ALJ remarked that during or following his physical therapy sessions, Kell consistently reported little to no pain or some pain resolved with therapy. *See id.*; R. 888–90; R. 896–99. Indeed, Kell reported improvement with some soreness, was able to perform exercises correctly though with some difficulty due to pain, and made progress toward his therapeutic goals. *See* R. 896–97; R. 902–07; R. 920. Later in 2018, Kell reported some pain post-lumbar surgery, R. 908, but the ALJ noted that Kell's records did not contain documentation of physical therapy after early 2019, R. 23.

Finally, the ALJ turned to Kell's history of neck pain and paresthesia in both hands. *See* R. 24. The ALJ noted that in 2019, Kell "[was] diagnosed with bilateral carpal tunnel syndrome, bilateral ulnar neuritis, and left elbow cubital tunnel syndrome after undergoing electromyography and nerve conduction studies" and had cervical degenerative disc disease. *Id.* Following surgery for his carpal tunnel syndrome and bilateral ulnar neuritis, Kell's incision healed well, and the ALJ commented that his motor skills remained intact. *Id.*; R. 769; R. 847; R. 850.[6]

The ALJ then compared this evidence to Kell's alleged limitations and the other doctors' opinions in his case record. *See* R. 24–25. The ALJ stated:

> [Kell] testified that he needs to lie down during the day and naps albeit he complained in testimony that his medications kept him awake. Firstly, this subjective activity cannot be objectively verified with any reasonable degree of certainty. Secondly, even if [Kell] lays down as alleged, it is difficult to attribute that degree of limitation to [his] medical condition, as opposed to other reasons, in view of the medical evidence and other factors discussed in this decision. Overall, [Kell's] reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

R. 24. The ALJ considered the opinion of neurologist Dr. Alexander B. Todorov, whom the ALJ brought to the hearing to reconcile the "conflicting opinions" in Kell's case record. R. 24–25. Dr. Todorov opined that Kell had "degenerative disc disease/stenosis of the lumbar spine, with surgery . . . [,] carpal tunnel syndrome

---

[6] The ALJ also reviewed records that documented Kell's history of treatment for opiate dependence and concluded that he generally tolerated treatment well with good progress. *See* R. 23. Because Kell does not challenge the ALJ's findings as to his mental health, the court does not describe these records in greater depth.

surgery on the left and right in July and August 2019, left knee arthroscopic surgery in February 2018, and history of ankle dislocation in 2015," that Kell's surgeries were unsuccessful, and that Kell could not perform his daily activities. R. 24–26; R. 61–62. However, the ALJ discounted this testimony because it appeared that Dr. Todorov had ignored the medical evidence indicating Kell's postoperative improvements and that Dr. Todorov's testimony was inconsistent with Kell's reported activities.[7] R. 25–26.

The ALJ turned to the opinion of a state-agency consultant, Dr. Victoria L. Hogan, who found that Kell "could perform a limited range of light work with frequent postural with frequent handling/fingering bilaterally due to complaints of carpal tunnel." R. 27. The ALJ found this opinion "probative" but, "based upon the entirety of the evidence," reduced Kell's stated capacity to "occasional postural maneuvers." *Id.*

"Taking all of the evidence into consideration," the ALJ determined that Kell "[had] a history of surgeries to the lumbar spine, both wrists/elbows, and left knee, as well as obesity and degenerative disc disease of the cervical spine" and "[had] complaints of pain with doing any heavy exertional activity." R. 25. The ALJ noted that "a limited range of light work" was "consistent with the overall record that

---

[7] The ALJ also considered the report of Kell's wife, who stated that Kell read, took his medication, sometimes went to doctors' and therapy appointments, watched television, went to church and social gatherings, could cook and do some laundry, could drive and shop, and wore wrist braces. R. 25; R. 259–61.

11

show[ed] [Kell's] symptoms significantly improved postoperatively and with his reported daily activities." *Id.* Accordingly, the ALJ determined that Kell had the residual functional capacity

> to perform less than the full range of light work as defined in 20 CFR 404.1567(b) except occasionally lift and/or carry, including upward pulling of twenty pounds and can frequently lift and/or carry, including upward pulling of ten pounds. [Kell] can sit for six-hours in an eight-hour workday with normal breaks, and stand and/or walk with normal breaks for for [sic] six hours in an eight hour workday. [Kell's] ability to push and/or pull, including operation of hand controls is limited to frequently up to the lift and carry restrictions of twenty and ten pounds. [He] can occasionally climb ramps and stairs, balance, stoop, kneel, crouch but no crawling. No work at ladders, ropes or scaffolds, unprotected heights or around dangerous machinery. No frequent exposure to extreme cold or heat, and no heavy vibratory types of jobs.

R. 21.

At Step Four, the ALJ used the vocational expert's hearing testimony to conclude that Kell could perform his past work as a hand packager. R. 28; R. 66–69. The ALJ also determined that Kell could perform other work as a ticket taker, a garment sorter, or an inspector. R. 29. As a result, the ALJ concluded that Kell was not disabled. *Id.*

## V.

Kell asserts that the ALJ's decision is unsupported by substantial evidence because the ALJ improperly discounted his pain-related testimony and did not give significant weight to Dr. Todorov's hearing testimony. *See* doc. 17 at 5, 13. However, these contentions are unfortunately unavailing.

12

A.

Kell agrees that the ALJ accurately summarized his testimony but claims that the ALJ incorrectly discredited it. *See id.* at 4–5. The ALJ described that Kell testified that he needed to lie down during the day and nap; that his medications kept him awake; that he had lower back pain, stiffness and numbness in his feet; that he had knee and hand pain; and that he could not bend or stoop. R. 21–22. Kell testified that he could sit for 30 to 45 minutes without stiffening and having to get up and could stand or walk for about 30 to 45 minutes. *Id.*; R. 46–47. He also testified that he could manage household chores, including laundry, dishes, and light cooking; occasionally vacuumed, mopped, and swept; and could drive to church, to the store, and to doctors' appointments. R. 21–22.[8] Finally, Kell testified that ultimately "[s]evere pain" and "[his] mobility" kept him from working despite his medication and surgeries. R. 44–45; R. 48–49.

After reviewing the records of Kell's medical visits, the ALJ discounted Kell's testimony about the limiting effects of his pain because the ALJ found that "a limited range of light work" was "consistent with the overall record that show[ed]

---

[8] Later in his brief, Kell argues that the ALJ failed to accurately describe Kell's daily activities, and so the ALJ could not have relied on these activities to discredit other testimony in the record. *See* doc. 17 at 16. However, the court does not discern discrepancies between the ALJ's description of Kell's activities, Kell's self-report and testimony, and the report of Kell's wife. *Compare id.* at 15 (Kell's brief) *and* R. 247–52 (Kell's self-report) *with* R. 21–22 (the ALJ's decision) (summarizing Kell's testimony about his daily activities) *and* R. 26 (the ALJ's decision) (summarizing Kell's wife's statements about Kell's daily activities).

[Kell's] symptoms significantly improved postoperatively and with his reported daily activities." R. 25. In other words, the ALJ determined that Kell could do more than his testimony suggested given his consistent improvements following surgeries and physical therapy. *See id.* Indeed, the ALJ cited a variety of records in which Kell reported his improvements in pain and mobility to his doctors, and in these records, doctors noted that Kell was making progress toward his therapeutic goals with exercise. *See, e.g.*, R. 23; R. 888–90; R. 896–99; R. 902–07; R. 920.

Kell does not dispute that at least some of his records indicate his improvement, *see* doc. 17 at 9–11, but he argues that other evidence demonstrates that "any improvement in [his] pain has not been linear and has fluctuated throughout the relevant time period," *id.* at 13. In support, Kell cites records that he says report continued pain after his surgeries. *See id.* (citing R. 523; R. 527; R. 532; R. 536; R. 619–20; R. 908). The records Kell cites from September 2018 state that he was about to start physical therapy and that his left knee caused him pain, especially when using stairs or standing for "prolonged periods." R. 536. The records from October 2018 state that he "report[ed] continued pain but ha[d] improved since surgery" and "report[ed] difficulty performing daily tasks." R. 908. The records from March 2019 state that he had "bilateral knee pain" but "[was] doing very well," that "[h]is back [was] improved," and that he "still ha[d] some lack of range of motion and some back pain, but he [was] tolerating it." R. 523; R. 527. Additional

14

records from 2019 state that Kell reported his pain currently at "3/10," at best "1/10," and at worst "8/10," and Kell was referred to "skilled physical therapy" to address his mobility, pain, and motor control. *See* R. 620–22.

In sum, the records Kell cites, while arguably evidencing some of the fluctuations he references, are consistent with the finding that Kell had physical limitations but improved with surgery and physical therapy. Importantly, the ALJ must consider the entire record when evaluating a claimant's pain-related testimony, including by reviewing medical evidence and statements by the claimant and his or her doctors for potential inconsistencies. *See Costigan*, 603 F. App'x at 786 (citing 20 C.F.R. § 404.1529(c)(1)). Because the ALJ considered these factors to determine that Kell's statements about his pain were not fully consistent with the record, and the evidence reasonably supports this finding, the court will not disturb the ALJ's articulated credibility finding. *See Mitchell*, 771 F.3d at 782.

B.

Kell also argues that the ALJ should have given Dr. Todorov's opinion "significant weight." *See* doc. 17 at 13. An ALJ cannot give specific weight to a medical opinion and instead must consider the opinion's supportability and consistency to determine its persuasiveness. 20 C.F.R. §§ 404.1520c(a)-(c). Here, the ALJ recounted that Dr. Todorov testified that Kell's surgeries were not successful and that he could not work or perform his daily activities for eight hours

15

each day. R. 25. The ALJ decided that this opinion "[was] not persuasive or probative" because "[i]t appear[ed] that Dr. Todorov failed to review all the medical evidence of record that show[ed] [Kell's] symptoms significantly improved postoperatively." R. 25–26. The ALJ found that Dr. Todorov's opinion "[was] inconsistent with [Kell's] wife's statement[s]" that Kell could cook, perform some household chores, drive, and manage money. *See* R. 26. The ALJ also noted that, based on the records, Kell had not had knee or lower back problems since late 2018 or early 2019, and his carpal tunnel syndrome had improved. *See id.* Because the ALJ properly relied on differences between Dr. Todorov's opinion, the medical records, and Kell's activities to discount Dr. Todorov's opinion, the ALJ's decision not to give the opinion significant weight is supported by substantial evidence.

## VI.

In summary, the ALJ's decision denying benefits is due to be affirmed because it is supported by substantial evidence. A separate order follows.

**DONE** the 1st day of February, 2022.

_____<br>
**ABDUL K. KALLON**<br>
UNITED STATES DISTRICT JUDGE